The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's case will be called as previously announced and the times will be as allotted to counsel. The case today is Sierra Club et al. v. US Dept of the Army Corps of Engineers et al. Appeal number 20-2195. Attorney Cassidy, please introduce yourself for the record and proceed with your argument. Good morning, Your Honors. Kevin Cassidy on behalf of Appellants, Sierra Club, National Research Council of Maine, and Appalachian Mountain Club. And with the Court's permission, I would like to reserve two minutes of my time for rebuttal. Yes, certainly. Thank you, Your Honor. May it please the Court. This Court should reverse the District Court's denial of the preliminary injunction because Sierra Club has shown a likelihood of success on the merits for several of its claims. But even if we haven't, at a minimum, we have shown serious questions going to the merits that warrant an injunction when balanced on the sliding scale. Most notably, the Army Corps' decision to limit the scope of its NEPA analysis was arbitrary and capricious, directly contrary to its own NEPA regulations and to the Clean Water Act permit it ultimately issued to Central Maine Power. The correct balancing did not take place because the District Court erred in not analyzing Sierra Club's certain on-the-ground irreparable harm. As our witness testified, the new 53-mile transmission corridor will be a scar on the landscape of a globally significant and ecologically significant region that will cause, in EPA's words, substantial aquatic impacts and fragmentation of forest resources. That harm will be permanent in Segment 1 of the project and will utterly destroy the status quo. And we know it was certain to occur because the construction activities had, in fact, begun hours prior to this Court's injunction. Turning to the merits, Your Honors, this Court held in United States v. Coalition for Buzzards Bay, where it rejected an agency's interpretation of its own regulations that our deference cannot be wielded to read a provision in a way that utterly destroys the plain language. That is exactly what the Army Corps did here in limiting the scope of its NEPA analysis. And so I want to start with the plain language of the regulation that the Army Corps is supposed to look at when determining the scope of its NEPA analysis. The Army Corps has to look at four factors and determine whether there's sufficient federal involvement and control and responsibility to look at project-wide impacts for the entire project. The first factor I'll call the merely a link factor, and that's the only factor that specifically calls out corridor-type projects like we have here. Now, merely a link can be plainly understood, and the Army Corps provides an example for us in its regulations as to what it thinks it means. And that example is of a 50-mile transmission corridor that crosses one river body, a single jurisdictional water. That's obviously not the facts of our case. The Army Corps' reading of its regulation would turn merely a link into merely hundreds of links, or to be more specific, more than 1,800 jurisdictional water bodies are crossed by this project from the Canadian border to its terminus in Lewiston, Maine. And just on that point factually, if we set aside the water bodies that the transmission line crosses but that don't cause any disturbance with the water that would trigger a need for a CWA permit, how many waters are crossed or affected that actually trigger some action from the Corps? Do you understand what I'm asking? I think so, Your Honor. First of all, I would point out that the crossing is not a word that we picked. It's a word in the regulation. So the Corps in its own regulation… But that's just my question. Factually, Your Honor, I don't think the Corps ever made that determination because it was looking at all the crossings. Did you put anything in the record that would give me a sense of how many actual waters are covered by the permit itself? Well, all of the waters are covered by the permit. Let me put it this way. If the only thing that happened was that the transmission line crossed the waters in the sense that it went over them, you would not need a permit under the CWA, correct? Yes, Your Honor. Okay. So given that, if we exclude all waters that are like that, how many waters are left in which there's dredging, filling, or something like that that triggers the need for a CWA permit? Well, you may be talking about impacts, Your Honor, and there's a percentage of impacts here that aren't… That's not what I'm asking. I just want a simple question. There's a number of wetlands. Yes. You keep emphasizing how there's so many discrete ones, which seems like a very fair point with respect to the Marialea Lake. You're saying it's more than one. I assume you think it's more than two. I know it's less than all wetlands under the transmission lines. So it's more than one and less than every water that falls under the transmission lines. I'd like to know how many waters it actually is. Do we know that? We don't know that, Your Honor, exactly. Because that wasn't determined by the Corps. They looked at a percentage. Counsel, the Corps argues that approximately 1.9% of the total project corridor has to do with waters affected such that it needs a permit. They then go on to specify that there are, within Segment 1, 164 acres affected, but almost all of those are only temporary effects, not permanent. They then separate out the power poles and say there are 93 of them out of 1,430, and they use that to support the 1.9%. The District Court found that the 1.9% figure was not at all arbitrary. Have I got this right? You do, Your Honor. And if I could respond to that. First of all, the 1.9%, that's the third factor that the Army Corps is supposed to look at, the extent to which the entire project will be within... I'm sorry, but I'm looking at the Army's Appendix B analysis under its own rules, under the first, merely a link. And that is where they are making these points. Your Honor, and I think that's the wrong factor to look at to make those points, that merely a link... The Corps gives the example. Merely a link is one single river crossing. To put that into our context of our facts, that would be if the transmission line ran from the Canadian border, it didn't cross or impact any wetlands, and got to the Kennebec River where they directionally drilled under the river and then went on its merry way. That's the Corps' example of... But they also give a second example. Five minutes remaining. They do, Your Honor. And the second example talks about when the wetlands are dispersed throughout the project area, which is exactly what we have here. It's dispersed, but we're still trying to figure out how much is impacted, because if we start from the premise that Judge Barron keeps pressing that merely aerial crossing isn't impactful, we're trying to figure out what percentage or how significant the impact is. Yes, Your Honor. Well, first of all, aerial crossings do impact waters of the United States. But you're just not answering... Aesthetics, yes. No. Even environmentally, Your Honor. They open up the rivers to... They take the tree canopy out. They open up... These are small water bodies. But there's no federal action unless the whole transmission line is federal just by the crossing. The federal action is the permitting by the Corps pursuant to the CWA. And there's no permitting with respect to just the fact that it crosses over them. So the question that we keep asking with respect to merely a link is if it's one crossing, the Appendix B is clear. That does not suffice as a factor that supports concluding that the whole project is a federal action. And that would mean that those overland crossings would not be themselves federal actions. Correct? Your Honor, I guess I would go back. I want to answer your question direct, but I would go back to the regulation because the regulation says crossing. It doesn't say impacts. And here, the impact... It talks about the regulated activity, right? That's right. That's not a regulated activity. If it's crossing, it's not a federal action. The regulated activity is the activity the Corps is permitting. Correct, Your Honor. And that regulated activity is what triggers its jurisdiction under the Clean Water Act. But its obligations under NEPA are to look at the impacts related to that. Counsel, I'll add to my confusion here with another question. You identified at the opening three different themes. You said that the limitation in scope was arbitrary and precious under the APA. You said it violated their own regs, and that's what we have been discussing, which is the linkage first test under their regs for corridor projects. You then listed separately the Clean Water Act. So am I hearing you now say that this argument you're making is not under Appendix B but is under the Clean Water Act? No, Your Honor. I referenced the Clean Water Act to show that the Corps is actually exercising its authority and control over this project beyond aquatic impacts. And that's Special Condition 17 in the Clean Water Act, and there are others that we list in our brief, where the Corps has conditions in its permit that are enforceable by the Army Corps through its Clean Water Act permit that go beyond just aquatic impacts. Okay. So your reference to the Clean Water Act is in furtherance of your argument under Appendix B that if you put it all together, this constitutes sufficient federal control over the project to have triggered a full project review. That's correct. Okay. That's exactly right, Your Honor. That's where that comes in because here the Army Corps, when it looked at the scope of its NEPA review, it limited that scope to only the impacts that you're referring to, the 1.9%. However, when it issued its permit and there was other federal agencies involved in the process, so it's the cumulative federal involvement of the Corps and other federal agencies. But how, for instance, is the presidential order, which is simply dealing with crossing the border, how does that connect to the environmental impact? Or the FERC regulations, which go to rate? It seems like very distinct federal interests from each of these agencies. Well, I'll just say, Your Honor, for the Department of Energy, the last three border-crossing transmission line projects that were done here were done with environmental impact statements by the Department of Energy that looked at the entire transmission lines. That's the more you can ask. May I finish answering the question? Yes, certainly. So that's one issue. Secondly, Your Honor, those from the- What is the legal significance of that issue? I mean, it could be that they did them before and decided based upon the outcome there that they really weren't needed and to be more circumspect on this project. Well, to answer your question, Your Honor, we know that the Department of Energy has done an environmental analysis for the entire project here. That was through the motion for reconsideration that CMP filed on the injunction this court issued. They brought that up, and we now have it because the Department of Energy issued that on January 14th, the day before this court's injunction. So they have done an environmental analysis of the whole project. There's no rational reason why two different agencies have done two separate environmental analyses of the same project, and that goes to our- So given that, what relief are you seeking? We're seeking a remand, Your Honor, to the district court with instructions to continue this injunction. But with the case itself, we're seeking that the court has to go back and redo its NEPA analysis with the proper scope. In fact, the district court said if the scope issue is wrong, it's going to require a remand because the court- But how does the fact that DOE chose to do the whole project show that the court was wrong in deciding the scope did not require the whole project? I don't follow that. That doesn't necessarily show that, Your Honor, but NEPA has a separate regulation that says agencies can't- you're not supposed to have disconnected actions. In other words, if agencies are going to look at one project, they're supposed to do it together, and that's our connected actions. We couldn't bring that below- No, but the connected action isn't the EIS. The connected action is the DOE permit. So that's Judge Thompson's question to you. What is the connection? There's two different things you've got going here. One is a connected action claim that you just referenced, which is not what I thought you were arguing to us, which is a claim that there's a connection between the permit and the core action in permitting the various activities with respect to the wetland. That's not a claim necessarily for a whole project review. I thought you were making an Appendix B argument for a whole project review, which is under the factors of Appendix B. That's not the connected action regulation of CEQ. So with respect to Appendix B, Judge Thompson's question, which I also have, is how does the existence of the DOE permit, which relates to the crossing of the border, provide a basis for saying that there's sufficient federal involvement and control over the entire private transmission line such that we treat that whole line as a federal action? Your Honor, the description of the DOE only relating to the border crossing, it's belied by their own interpretation of what they need to look at is from the border crossing to the first point of interconnection. That's in Lewiston with the grid. So that's why they looked at the entire line and did an environmental analysis on the entire line. So that's how those two things work. Is your argument that the DOE permit itself then makes the whole thing a federal project? I didn't think you had made that argument to us. We haven't, Your Honor, because the DOE permit hadn't issued. No, no. Are you making that now? I'm not making that argument now, Your Honor. Okay. Well, then if you're saying that if the DOE permit does not itself make it all a federal action, Judge Thompson's question is what is the connection or reason to think that the existence of the DOE permit transforms the permitting activity by the Corps under the CWA from just individual regulated activities by the Corps into the whole private line being itself a federal action? Your Honor, it goes to the cumulative federal control over the project. It's one piece of it. I'm not stressing that here today. The more important piece is the Endangered Species Act consultation with the Fish and Wildlife Service that resulted in the conditions that are in the Army Corps' permit that the Army Corps can enforce that go beyond just their jurisdictional waters. Okay. We'll hear you on rebuttal. Thank you, Your Honor. Attorney Cassidy, if you could please mute your device, and at this time if Attorney Hall would please introduce yourself on the record. Proceed. May it please the Court. Jeffrey Hall on behalf of federal defendants. This appeal concerns whether the construction of a power transmission line through New England bringing renewable energy to New England should be enjoined. Now, Mr. Hall, believe me, we know what the case is about. So I have a question for you. We apparently would be the first court to be reviewing a claim of noncompliance with Appendix B of the first court of appeals. I know the 8th or 10th had an alternate holding. So if we look at the four factors, and you start with the in-corridor projects, mere linkage is not enough to invoke a full review of everything. What is the purpose of that mere linkage requirement, or exclusion, if you will? Your Honor, the purpose of the mere linkage requirement is precisely for corridor-type cases like this. That's what makes Factor I the most applicable here. And it's designed to make sure that just because a project passes through a federally regulated territory or land or needs a permit, something like a discharge permit here, that doesn't convert the entire project into a federal project. That's certainly a frequent case that any large-scale transmission or corridor-type project, any pipeline, is going to need to probably cross some type of wetland or water of the United States or other jurisdictional area within the court's jurisdiction. When you have numerous and dispersed, how are we supposed to look at the mere linkage factor? Your Honor, I think it is merely a link because the very limited area is what's most important about that. Functionally, the discharge here is a very small portion of the corridor-type project. In general, the mere linkage should give some degree of deference to the agency in sort of construing its own regulations and also applying them here because you're going to have corridor-type projects like this where it crosses, say, one large river like the Kennebec River. The regulation itself comes from the Winnebago Tribe case where it needs to cross a much larger river. And so just because you have sort of that split into smaller segments and more jurisdictional crossings that are smaller and result in the same area doesn't mean a different result. Why would that necessarily be the case? Because the concern is if you had, let's say, every mile, a tenth of the mile had some water affected through the whole thing, you can start to see that it seems a little odd to call the regulated activity merely a link each time, even if you had 400 of them, 500 of them. Whereas it's different if you have one river, even if it's a relatively large river, that's the only activity, so why would you look at the whole project? You would look at just that area. But when it's each area all the way through, you would start to think that, well, maybe we should be looking at the effect of all this permitting on the entire project given how it's pervasive through the whole area. And as I read the reg, it just doesn't address that issue one way or the other. It's just not what they were thinking about. In fact, as you say, at one point I think you say that the example is in a positive. It just suggests to me that that merely a link factor just doesn't address this case. Your Honor, this is a corridor type project, so it addresses to some extent and generally a corridor. No, no, no. The question is whether the merely a link factor addresses a case of pervasive appearance of waters throughout the whole project, no one of which is all that substantial and the sum total of which itself is no more than 1.9%. That seems to me to fit perfectly under the third factor. But as I understand the EA, it also relied on the first factor. And I just don't quite see how the reg itself is addressing this situation. That doesn't mean it's necessarily a problem. It's just odd to read the reg as if it addresses it when it doesn't. Yes, Your Honor. So what the EA did was it went through each factor and asked the question that the regs require you ask, does this convert it into federal action? And so under the first part, whether it's merely a link, yes, they thought it sort of fit within the notion of a merely a link because of the small area. Even if you disagree with that, as you said, the third factor, that's where it falls in. But certainly the first factor doesn't require then that this be a federal action. And later on, not only are there examples, but there's also the description of the fact that what it's really getting to here is does the permitting bear on the origin and the destination and the entire length of the project where it's being cited? And that's just not the case here. It's not the case in terms of what was being permitted, but it's also certainly not the case factually. We have a strong factual case that all of this really depends on Maine's permit and their ability to get land. The question I asked to your point, do you know how many waters the Corps is engaged in regulating? Through the project director? Page 404 of the appendix, I think, gives a good outline of this. It mentions fill. So 82 wetlands are permanently filled. Four Vernal Falls are permanently filled. I don't know if I have a number for the ones that are temporarily impacted or cover type conversion. I think the Corps went primarily with acreage there because that was an easier way to represent it. And is it fair to say that those 82 plus four are distributed throughout the length of the transmission line or are they concentrated in particular segments of it? Do we know? I believe they are. I don't know. It does give a description in the segment by segment of some of those numbers. I don't have them offhand. I think there is some extent dispersion, though in segment one, there's more sort of few crossings of wetlands. Last question, just a technical question. The way I understand that this operated is there was a single permit issued by the Corps with respect to all of the wetlands. Is that right? Yes, Your Honor. That's correct. Is that how it normally would work? In other words, if you have dispersed wetlands, why isn't there a permit for each wetland so that you'd have roughly 50, 60, 80 different CWA permits for the Corps instead of having one permit that's all of it? I just don't understand how that decision gets made. Your Honor, I can't necessarily speak to how that's made in every case. But here, I think because they are small, they are all within one project. It certainly makes sense to do it that way. I wouldn't necessarily say that's required by, say, the Connected Actions Reg, which applies primarily to EIS. That's my next question, is whether doing it this way is sort of an end-run around the Connected Actions Reg. Well, it's certainly not, Your Honor, because they're putting all the wetlands together and analyzing it. So it's not an end-run around that. And it's falling within the NEPA requirements that are within the other regs that the Corps has promulgated on scope. Could you tell me why the Corps decided to go in a different direction from the other two similarly situated projects? Yes, Your Honor. So my understanding is that, one, the closely similar requirements, which is in the regs for notice, which I think is what primarily they get at, is only for ones where it's required. The Department of Energy EISs, none of them are required to issue an EIS or, as I understand it, certainly no longer are required to examine the entire line from the crossing to the first interconnection point. And the DOE EA, in this case, makes that clear. As a matter of sort of discretion, it has in the past. And I don't know if I have a clear answer for exactly why, although I think it just depends upon administration priorities, to some extent, whether or not the DOE has, as a matter of a presidential permit, has looked at the broader environmental scope. But it's certainly not required to. And so it doesn't give anything to, in the Corps' analysis, on whether that requires the Corps then to take a look at the entire line under its own regulations and under public citizen, the notion of what's reasonably, there's a reasonable causal connection. I have a question. Judge Barron has asked about the efficacy of the mirror link requirement as to what the Corps examines in corridor-type projects. This essentially is a transmission lines corridor project. What are other examples of corridor projects? I mean, it's a term that seems to include projects that are sort of qualitatively different. Yeah, so one big one would be a pipeline. So that's the most frequent example. For a lot of pipelines in a lot of the United States, there's nationwide permits that are relied upon. In New England, the Corps just does not rely on nationwide permits. That's why a verification wasn't used here. Time has expired. Go ahead and answer. So that's why it wasn't used here. And pipelines, there's a whole verification process. But I'll just say, in general, pipelines are going to have a lot more of environmental impact because they're going to have to run along the land or be buried. And nevertheless, there was the nationwide permit EA that was set up, which was only an EA, and examined in the Boston case. And that verification can be used for pipelines. Okay, so we have pipelines. We have these electric transmission lines. Are there other sort of corridor projects? Roads, Your Honor, would be another example, I believe, of a corridor type project. So there are a number of examples of court cases involving causeways or other things. And in fact, in the examples it provides in the Corps regulations, it talks about roads. So that would be another one. Okay, thank you. I had just some – I think Judge Thompson was asking about the significance of the DOE EIS. That EIS is of the whole project. How is it supposed to work when there's multiple agencies, as the Corps regulation contemplates, if there could be multiple agencies involved, all themselves taking some federal action on their own? And the Corps regulation contemplates that the sum total of those discrete federal actions in certain instances can transform the whole project into a federal action. Would that mean that each federal agency that did a federal action on its own, in a situation in which the cumulative effect of all those actions was to make the whole project a federal action, that each one of those agencies would have to perform its own whole project EIS? That's not my understanding of the regulations, Your Honor. And forgive me because it wasn't briefed or discussed extensively here, but my understanding is that you can do – it's not necessarily required. You can do tiering and you can do sort of supplemental environmental impact statements so that you're – not every agency will have to perform its own whole agency EIS. So just in terms of this particular dispute, since there is an EIS out there from an agency of your administration, who is the government, for this whole project, is the Corps not endorsing that? Has DOE walked away from that EIS? In other words, I just don't fully understand what this dispute's about, given that there is a whole project EIS. Is the idea that the Corps has to perform a separate one? If you're telling me under the regs there's no obligation for the Corps to provide a separate one anyway, then is the idea here that you're disavowing the EIS that is out there, or is there some reason the Corps is not simply saying there is an EIS? So what needs to be done? I mean, it's just that they got what they need. I just don't really understand that aspect of it. Yes, Your Honor. So the Corps could – it's already issued its EA, and so I think there's – some of it is just the sequential nature of them. The Corps issued it first within its jurisdiction. DOE came later and issued a project-wide analysis. And so I don't know that there's any requirement that the Corps come back and sort of comment on that. And I certainly don't have any plans or requirements for that. But in terms of what happens in this case, I believe that plaintiffs are trying to now challenge the Department of Energy analysis. And so if that's going to proceed, that should probably happen at the district court first. But I guess I'm asking, does the DOE EIS effectively move the claim here? Because there is an EIS, so what are they asking for? They haven't made any argument to us that the Corps has to provide now a separate independent parallel EIS, because that would seem odd if two agencies have to have their own independent EISs. I don't understand what's alive here. Yes, Your Honor. Before you answer, is the plaintiff arguing that in the presence of a currently full Oops, I'm having trouble. That the Corps isn't sufficiently considered DOE's EIS? Your Honor. And that now that you have a full one, you're required to look at it in case it means you want to make different decisions? I just don't understand. Your Honor, I also am not quite sure what their argument is on this point. But I would say that I don't know that there's any requirement that the Corps come back and then take a look at the DOE analysis. Your Honor. I'm sorry? If the agencies aren't working together, and if the Corps is the lead agency, why wouldn't you take a look at it? Are you still the lead agency? Your Honor, I'd have to go back and look at the EA to see. I don't know if the Corps was the lead agency, at least for the analysis that the DOE is performing for the border. The Corps' regulations, though, provide that for precisely this type of scenario where it's examining what's within its jurisdiction, where it doesn't sort of overlap with these other agencies and what they're looking at. It doesn't need to incorporate that into its analysis. So I do think this is determined by the Corps regs. And if the plaintiffs want to make more of a case on exactly how the Corps should look at the DOE analysis or that there's some problem with the DOE analysis, I would submit that that should be done at the district court in the first instance. Is there any reason to think, because this is just, I mean, one possibility is maybe everyone could agree on this question, then this case goes away. Is there any problem the Corps has with, I understand the reason the Corps might be object to having to produce a new EIS, given the time-consuming nature of that. But when there's an existing EIS, is the Corps just taking the position that it can ignore DOE's EIS in going forward with the project? Or is the Corps saying we've looked at the EIS and everything we're doing is in accord with it? Or what? I just don't really understand. We've got one arm of the government with an EIS and then another arm of the government without one. And that one seems to be doing its permitting without looking at the other EIS, and we've got somebody in court saying there needs to be an EIS. It's a little confusing. Your Honor, the Department of Energy's analysis came to the same conclusion, so I don't think there's any contradiction between the two, that there's not a significant impact within the meaning of NEPA. I'm just saying, has the Corps done any analysis of the EIS where it could just look at the DOE EIS, represent to the Court that it concludes that that's consistent with its fondness, and therefore it's made that determination based on an EIS? What would be the... Your Honor, I am not aware that the Corps has done that. I don't think the regulations require that it take on that extra burden, especially in a case like this when both of them reach the same conclusion of no significant impact. Mr. Hall, I assume that the Department of Energy has different expertise than the Corps does, and I assume that the Corps was concerned about the Clean Water Act and Rivers and Harbor Act permitting, and was the Department of Energy tasked with looking at the same issues as to an environmental impact statement as the Corps? Your Honor, the Department of Energy is not in this case, and so I need to be careful in sort of representing any position on its behalf. But when I looked at the analysis it performed, what it appeared is that it did a thorough analysis, including things involving water, if I recall correctly. But it was much more... It was comprehensive, and then it looked at quite a lot of issues along the entire... Could you just answer this question? Because I find maybe it's a version of Judge Lim's question, which is just puzzling to me about how the Corps Appendix B operates. Appendix B seems to be deciding whether something is a... even though it's privately built, and even though chunks of it are not subject to any regulated activity by any federal actor, nonetheless the whole project can be deemed a federal action. Correct? Yes, Your Honor. Okay. And then what supposedly is supposed to happen, I guess, is the Corps is then responsible for doing a scope analysis of all the different possible environmental impacts of the whole project apart from what the Corps is responsible for, not just water, but any possible environmental impact. Isn't that the way the Appendix B works? Well, I think it interacts with the EIS regulations generally and for the Corps. And so my understanding of it would be that it would depend on who's the primary agency for an EIS, which is a meaningful term and not really so much in the EA context. But if the Corps were not the primary agency, my understanding is that it could potentially tear off... If the Corps were the primary agency, it would be charged with looking at the environmental impact of those aspects of the project that don't affect wetlands, even if those impacts had nothing to do with anything within the Corps' jurisdiction. That seems to be how Appendix B is written. Is that right? Yes, Your Honor. That's my understanding. Of course, a lot of that information would come from other agencies. So that suggests to me that if DOE did an EIS, there's no reason of the whole project, there's no reason to think it would do any different analysis than the Corps itself would do of the whole project because each of them is way outside their expertise in looking at all the impacts of the whole project, right? Yes, Your Honor. So just let me be clear. I'll have to go back and take a look at the DOE's analysis. I'm not sure that it necessarily characterized itself as an EIS, but if I recall from taking a look at it, it might have... The question is sort of did it do the same analysis as would be required under those. I know it took a look at the entire project, and I'd have to go back and check that it characterized itself as doing what an EIS would do. But you're right, it did take a look at all of the effects that would, from what I recall, would ordinarily be looked at by the Corps as one piece or if the Corps was the primary on the EIS. Mr. Hall, my memory is the Corps was not the primary, but regardless, when DOE does its examination and draws its conclusion, at that point, the Corps analysis was already out there, correct? Yes, Your Honor. And is there any reason to think that the Department of Energy did not consider the Corps analysis? No, Your Honor. I believe it said it did, that the Corps EA was available and then it reviewed it. And I'm not aware of any contradictions between them. That's what I thought. Thank you. Okay. Further questions? I guess I just have one. You've heard all this conversation. Is there any representation the government can make about given that there is an EIS, that the EIS relied on the Corps' analysis, yet you seem to be making a point for the government arguing that the Corps doesn't need to do an EIS. I guess I just don't know if there's some way in which the government could just say, well, actually, there's just, in our view, the government of the United States has done an EIS for the whole project, factoring in the relevant things. It's there. And therefore, if the objection is there's no EIS, that's not a valid objection because there is an EIS, as opposed to the argument that we should pretend there isn't this EIS and the Corps doesn't have to do one. As if the government doesn't have to do one at all, which just seems, I just don't really understand where we are. Your Honor, for the EIS point. Yes, Your Honor. I don't understand. Are you looking for some precedential value of us saying the Corps doesn't have to, even though there is a full EIS? I just don't understand what the point of this is. Yes, Your Honor. So I think on the EIS point, you're right that as CMP arguments motion to reconsider, even plaintiffs sort of agreed that if the DOE analysis came along and was sufficient, then perhaps the Corps didn't need to do one. And I think that's right, especially if there's an incorporation by the Corps. The issue is just, I do not represent the Department of Energy in this case, and we have not done a full analysis of that. And so I'm not prepared to represent the position of the Department of Energy. Is it possible the Corps would just represent that they're incorporated in the EIS, and then this goes away? Your Honor, I don't know that the Corps has examined it such that I can make that representation today. How is it possible that there's not agency communication? This sounds crazy that there's not agency communication over something that, we're talking about an entire project with different agency responsibilities, but there's got to be agency coordination. Your Honor, there certainly does if there's an EIS and multiple agencies are involved and there's lead agency and everything. For environmental assessments- But there was an EIS. There was an EIS. Yes, Your Honor. Again, I would take a look at the DOE's analysis, and I don't think that there's any fault there in terms of what it says in terms of looking at and incorporating the Corps' analysis. And it's the best evidence of what kind of consultation occurred between the Corps and the Department of Energy. When the Corps was creating its analysis, it notes that it talked with the Department of Energy in terms of status, but again, because their specific focuses are different, it doesn't need to incorporate the Department of Energy's analysis on the border crossing into its analysis of the effects of discharge into wetlands. It performed an EA, assuming that the scope of it is correct, then that was sufficient on the Corps' behalf. And if there's some problem with what the Department of Energy did, again, it's not well presented so far. The EIS of DOE is being separately challenged? That's my understanding, Your Honor, from what's going on in the district court. And what's happening to the project with respect to that litigation? Are they seeking injunction on the project in that litigation? I'm not aware if they have filed a motion for a permanent injunction on that yet, Your Honor. Mr. Hall, we're going to hear next from counsel from CMP who can certainly advise us on the status of that new challenge which has been reported in the press. Are there further questions? No. Thank you, Mr. Hall. If we have further questions later, we'll let you know. Thank you, Your Honor. Thank you, Mr. Hall. Please mute your audio and video at this time. And Mr. Dunlap, please introduce yourself on the record. Good morning. May it please the court. Joshua Dunlap on behalf of Central Maine Power Company. I'll begin just by clarifying one point of confusion, and that is that there is no EIS. The DOE issued an EA fondly. And the difference between the two EAs is that the core, rightly in our view, looked solely to core jurisdictional wetlands that were impacted and issued a finding of no significant impact. The DOE went further. We suggest that it did not need to, but it nevertheless looked at the entirety of Segment 1 and still found that there was no significant impact. And so we suggest that this means that there's harmless error at the very least. That because the DOE has looked at the entirety of Segment 1, there is no harm, there is no significant... Did DOE... It's helpful to separate out the question of whether there's an EIS from the scope analysis, okay? But did the DOE, in doing a broader scope for its EA, proceed on the understanding that the whole project was a federal action? It did not proceed... My understanding of the DOE's EA is it basically was doing more than what it believed its due diligence needed to be, but out of an abundance of caution, it didn't look at all potential impacts, so that there... I guess, as I understand it, there's two different possibilities. You can correct me. One possibility is you look... There's a particular regulated activity, and there's a particular action by the federal government with respect to that activity. That's a federal action. And then there's a question of what is the scope of the impact of that particular federal action. Correct. It's possible that the scope of the impact, in DOE's view, of its particular federal action was broad and included the whole project, but all of it was with respect to the impact of its particular action, the border permit. That would be different than perhaps the core looking at its actions with respect to regulated activity and making a sentiment about what the breadth of the impact of those would be. And each of those could be different than what I understand Appendix B to be getting at, which is that regardless of the nature of the particular actions by any given agency, the whole project becomes a federal action. That seems to be what Appendix B is getting at. And when that happens, somebody then has to do a scope analysis of all of it as if the whole thing was basically being done by the federal government. And that might involve a different scope analysis than the scope analysis of the range of impacts of a particular agency's federal actions. Does that make sense to you? Well, I might describe it in a slightly different way, Your Honor. In my view, the scope of analysis question is the question of whether or not the entire project has become federalized because, in this case, the Corps' action was so significant that it approximately caused, as the Corps' regulations talk about, approximately caused the environmental impacts of the project as a whole. Because under Appendix B, they're also relying on the cumulative impact of the other federal agencies as well. Well, they're asking whether or not it has been federalized by not only their own, but also whether or not there's such involvement by other activities that it should be looked at in its entirety. And in this case, that factor wasn't there. Time has expired. Go ahead. Thank you, Your Honor. The DOE's contribution to this project is a very narrow one in that it looks only at the border crossing. And so those are two separate actions that, in this case, did not federalize them. No, I understand. But did DOE, in doing its whole project review, do it because it concluded that the whole project was a federal action because the whole thing was federalized by the virtue of its permit? It did not conclude that the entire project was federalized as a result of its action. It's my understanding of the DOE's EA. So, in theory, its EA could be different in focus than the EA that the parties here are seeking from the Corps if they're right about how to apply Appendix B. Yes. There is no requirement, for instance, that the Corps look to the DOE's EA, which was a subsequent EA. There is no lead agency requirement under the governing regulations  it needed to do anything with regard to the DOE's EA. Mr. Dunlop, just a factual question. I had understood from your opening that you say Department of Energy did a broader EA than it was required to do. But I thought what you said was that that EA was not the entire project but was Segment 1 of the project. Which was it? It looked at Segments 1, 2, and 3, Your Honor. Okay, and that's not the entire project? That is not the entire project. If I said entire project, I apologize. I misspoke. It looked at the entirety of Segment 1, which is now the only thing that plaintiffs put at issue in this case given that they've narrowed the scope of their request for the injunction. So it does cover the entirety of Segment 1 as well as 2 and 3. I don't want to presume on the court's time. I do also want to clarify because I know there is some question about the status of the litigation over the DOE's EA. At this point, what plaintiffs have sought to do is they've requested that the DOE be added as a party to this ongoing proceeding in the district court. And there has been no action on that. The district court has not yet ruled whether or not the DOE can be added as a party. There's been no request for a preliminary injunction or the like regarding the DOE. Judge Barron, okay, we can't hear you. If all that's left is of the requested relief by the Sierra Club here concerns the EA for Segment 1 and you're representing to us the DOE has done an EA of all of Segment 1, is it your understanding that the EA by DOE of Segment 1 is any narrower with respect to the scope question than the EA that the Sierra Club is seeking from the core? I'm not quite sure of your question. I don't either. Okay, well, they're seeking an EA from the core. Yeah. They object to the EAs that the core did because it didn't look at the whole project, right? Correct. You said to us that they've been narrowed the scope of their relief so all that's at focus is Segment 1. Yes. So presumably what they would then be now objecting to is that somehow with respect to Segment 1 impacts within it beyond those that the core looked at were not considered. Yes, so they are suggesting that the core should have looked at other effects within Segment 1. Okay. Which we contend the core did not need to do. Are all of those effects considered by the DOE's EA as to Segment 1? Yes. Okay, so from your perspective what are we to do with the fact that we have a lawsuit against a federal agency seeking an EA that would be broader in scope with respect to Segment 1 when a different agency has already done an EA of that exact scope? What are we doing here? I just don't quite understand it. I would suggest two things, Your Honor. A, the core's EA can be upheld on its own for the reasons that we've articulated in the brief. And further we see the DOE's EA playing in as a harmless error analysis. As this court's Save Our Heritage decision made clear it is pointless to remand for a differently named analysis or I would suggest here an analysis that was already conducted by another agency especially when you overlay that with the fact that this EA while it defined the scope of its analysis to be the court's jurisdictional wetland it went beyond and discussed further impacts. Putting that last point aside just so that I understand now what do we do about the fact that the court as I understand it wants to proceed here without identifying to us representing to us that it's even looked at the EA that DOE did. It is not error on the part of the court to not look at the DOE's EA because it followed after the court's own so the court's own action had come to an end. But then I guess what I'm saying how can it be harmless error if the court is willing to proceed without having ever told us that it's even considered that EA because what I understand is that the injunction is to stop the action until the court has given some consideration to that broader EA not just produce it and never look at it. So if there's an EA out there that's the right one. Their complaint really has the plaintiff's complaint has never really been that the court failed to look at the DOE EA that was not an argument that plaintiffs raised below is something that they sort of half-heartedly insert here. And they do so on the basis of a connected actions regulation that only applies to EISs and not EAs. And moreover they're trying to use it in order to sweep in private action in which the DC Circuit Court and Sierra Club in its 2015 decision made perfectly clear where there are separate actions and no federal control over the entire project the connected actions regulation does not add the private activity to the picture. So plaintiffs have brought this issue in late and it doesn't even really apply your honor we would suggest. And so it's become somewhat of a red herring that I don't believe should factor in significantly to this analysis other than to say that the plaintiffs came in at the outset seeking a preliminary injunction because no federal entity had considered all the potential ramifications of the construction in segment one which indeed now they have and we might suggest even at that beginning moment that was not a valid concern because the state agency had indeed looked at the entirety of the project segments one all the way through segment five and they concluded that there was no unreasonable impact. And that coming back around to where this argument began also feeds into the question of whether or not the project as a whole has been federalized. It has not. The court's action is not the proximate cause of the environmental impacts of the project as a whole in part because the state is the primary regulator here and carefully and closely looked at this and issued its permit for, excuse me, by the DEP. But DOE's EA was not in existence when the lawsuit was filed. Is that correct? It was not, Your Honor. Okay. It was not issued. So going back to Judge Barron's question, it's in existence now. How can we make a harmless error if we don't have a representation that you're gonna look at it? That is one of multiple bases we suggest for affirmance on the district courts order. But even if the court found that there was no ability to rely on the DOE's EA because the court had not yet gone back and looked at it, we suggest that the court's own EA suggests that there is harmless error here because it did effectively the broader work that was needed to seek here. You see, I guess here's my final stab at this. I understand that both you and the court and maybe DOE all may be of the view that there was no obligation to do an EA as broad as DOE did. And I understand the reason to preserve that point. There's a separate question, though, whether the court has any problem with the substance of the EA that the DOE did. If it did not, and it represented to us that it did not because it's after all the same government, then the particular dispute that we have in this action would seem to me potentially to be mooted. That wouldn't obviate the question about whether DOE still had a defense that if they didn't like the EA, it wasn't obligated to do an EA of that scope anyway. All of that would still remain. But the particular claim we've got here is that the court never did the proper scope EA. And it's just odd that we've got that dispute running at a time when a different agency has an EA of that scope and the court is of the same government as the agency that produced that. So if it has no problem with it, I don't really see why this particular dispute is live. And yet that could be solved by the DOE simply, the court simply telling us, we have no problem with the DOE. It's fine. There may be no obligation to have done it, but there's nothing in it that's wrong. I certainly can't speak for the court on that, Your Honor, but I would suggest that because they both came to the same conclusion when even though the DOE looked at more impacts, that there can be no disagreement because they both concluded that there is no significant impact. And we believe that both of those findings are correct. It is true that it is very odd procedurally here. For now, the plaintiffs to be challenged trying to inject the DOE below where this appeal is already pending and it is creating some questions. But we suggest, Your Honor, that certainly the court can take a look at both and see that there is no error here that caused any harm. So, Mr. Dunlop, at this point, the only federal injunction against the beginning of construction of Segment 1 is the one that this court issued. And I take it you think it is important that this court vacate that injunction. And as to the suggestion of mootness, it is not moot because the injunction is outstanding and some action needs to be taken on that.  I will, however, go through the process of reviewing a sister agency determination that was not complete until long after the court determination after the court has said that it consulted with DOE that there can be no disagreement. And, indeed, there is no point in asking one branch of the federal government to express a disagreement with another branch of the federal government. That is up to the plaintiffs to do if they wish to do so. Have I got that right? That's right, Your Honor. And it's very important that the injunction be lifted. And we would suggest for several reasons that the court need not even reach the irreparable harm or balancing of the equities inquiries if it concludes that plaintiffs are unlikely to succeed on the merits. But I would note here that the injunction in payment 1 would harm the public interest and significantly so. Okay, Mr. Dunlop, thank you. Can I just have one last question on that? Certainly. Suppose we disagreed with you on your reading of Appendix B and so we were going to continue the injunction because we thought the court had to issue an EA of the scope requested. What would your view then be of the significance of the existence of the DOE EA in the absence of the court acknowledging its existence or telling us what it thought about it? I would continue to suggest, Your Honor, that it demonstrates the harmlessness of any error, that the fact that any federal agency has done exactly what plaintiffs have requested here, and that is examine the harms of Segment 1, that there is no harm. So regardless of whether or not the court should have concluded that the entire project was federalized, that analysis has been done by the DOE. Thank you. One further step. I take it that if plaintiffs want to challenge the adequacy of the DOE matter EA, we need to remand the case to it because where presently the court was jurisdiction. And they have not sought a preliminary injunction against the DOE despite it being out there for three months, and meanwhile, the CMP has been significantly harmed by this injunction over Segment 1. Mr. Dunlop, that may not have been the best argument to make to the court which issued the injunction. Are there any further questions from my colleagues? Okay. Thank you. We will hear from plaintiff's counsel on rebuttal. Thank you, Mr. Dunlop. Please mute your audio and your video at this time. And, Attorney Cassidy, please reintroduce yourself on the record. Thank you, Kevin Cassidy, for the appellants. I want to respond to a few of the questions that I heard. First of all, the DOE, Mr. Dunlop is right, DOE did an EA and a FONSI. We don't think that EA and FONSI is any more appropriate or properly scoped than the CORE's EA and FONSI, and that's why we're challenging that. What's wrong with the scope of the DOE EA? They did not take a hard look at a lot of the impacts as well. They looked at the project, but they didn't say the EA is deficient. Is it deficient on the ground that you're objecting to the scope in a particular way in this particular lawsuit? And you've limited it to Section 1. We've limited it to Section 1 for the purposes of the injunction, not for the purpose of the entire case. And that's all we have on appeal is the injunction. That's correct, Your Honor. Okay. So is there anything with respect to the particular scope objection you've made here that the DOE EA doesn't address? Yes, Your Honor. There are several things. I mean, it addresses impacts, but it doesn't address all the impacts. And it addresses, you know, the project, but just like the core scope is limited in just to its Clean Water Act jurisdiction. And I want to say, Judge Barron, your description of Appendix B was exactly right. It's the difference between jurisdiction of the Clean Water Act and obligations under NEPA. So there will be a situation where you have a Clean Water Act permit that triggers NEPA, and you have to look beyond just the Clean Water Act jurisdictional piece into other impacts. And I want to mention the Sierra Club v. Marsh opinion in terms of – No, no, no. Counsel, we do – factually, Judge Barron asked you, hasn't the EA from the Department of Energy effectively given you the relief you are seeking in this lawsuit against the Army Corps? You answered no. But I would like a further explanation about why you answered no. Yes, Your Honor, because we think that this project should have had an environmental impact statement. The questions earlier were, if the EPA has done an environmental impact statement, why do we need to do this? I understand that question, whether an EA is sufficient. There is a threshold question before we get to the issue of whether you are entitled to an EIS, as to whether the scope of the EA was broad enough. And I had thought you were relying on Appendix B for that point. Appendix B does not entitle you to an EIS. Appendix B just entitles you to a broader scope analysis. And as I understand your briefing to us, the main thing you have focused on is an Appendix B error, and that your EIS arguments piggyback on that Appendix B error. So with respect to the Appendix B issue as to scope, setting aside intensity questions, but just as to scope, is there any respect in which the DOAE EA as the Segment 1 is too narrow in scope, vis-à-vis what you are telling us the scope had to be if we just focused on Appendix B? Your Honor, it looks at Segments 1 through 3. And in terms of the scope of what it looks at, particularly in its impacts, I think it is too narrow. So in other words, I'll give you a specific example, forest fragmentation, okay? The Corps specifically did not look at forest fragmentation as an impact in its EA. And yet, when it came to issuing the permit, it contained conditions that showed it had broad authority and sufficient control over upland forests. Did the DOAE look at forest fragmentation? They did not take a hard look at forest fragmentation. When you say a hard look, that's a different point than did they consider forest fragmentation. My understanding of the DOAE's EA is they primarily relied on the Corps for that type of analysis. I believe, actually, you may have misspoken. The Corps does, in fact, look at forest fragmentation, and it looks at the possible effects of restrictions imposed by the state environmental agency as to overhanging branches and debris from cutting trees getting into the waterways. Isn't that correct? You may think that was not enough, but I don't believe correct to say that the Corps did not look at forest fragmentation at all. Your Honor, it's mentioned in the EA. The Corps specifically said it did not need to look at upland forest impacts. That was outside of their jurisdiction. All right, all right. I take it that your response is no, the DOAE action does not give you all the relief you want on the preliminary injunction on Segment 1 because it relied on the Corps, and you're saying the Corps analysis was insufficient. Is that it? That's correct, Your Honor. Can I just point out one thing that's confusing me? The reason we started asking about why the DOAE didn't move the issue is because you told us, I thought, one of the reasons why it was problematic the Corps didn't do a broader scope is that DOAE had done it. But now you're telling us DOAE didn't do it. No, Your Honor. I never said DOAE did a broader scope. I said they did an analysis, and the oddness of this procedure is typically how this works and how this works in the prior transmission line cases is there's a lead agency, and that lead agency has cooperating agencies. Here the lead agency was the Corps. DOAE was the operating agency. The Corps took the lead. They issued their EA FONSI without putting it out for public comment, and then DOAE, meanwhile, was saying we're going to put our EA out for public comment. It made that commitment, and then it decided it wasn't going to do that, and it issued a separate EA, entirely separate EA, entirely separate analysis of the same project. That is not the way it works, and that's what sets up this procedural back and forth where one agency can point to the other agency's EA and say look at their impacts and the other agency can point to the one that just came, and so there's no coordination. There's no rational reason why two federal agencies like this would do two separate EAs for a single project other than to avoid looking at all the impacts cumulatively together, and the Sierra Club v. Mars case I was going to mention, Justice Breyer, then Judge Breyer, said an EA, no matter how thorough, can never substitute for an EIS, and one of the main reasons there was the public participation, you know. All right. This is rebuttal. You've made your public participation argument in your briefs. Do you have anything else to say as a rebuttal argument? No, Your Honor. That's all I have. Okay. I ask my panelists, do you have any further questions? No. Thank you. Thank you very much. Thank you. Thank you. It's been very helpful to have this oral argument in this complicated case of many moving parts. Thank you. Appreciate it. Thank you. That concludes arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may disconnect from the hearing.